May I proceed? Please. It would be hard to envision a case where a party more corrupted the integrity of the judicial system or showed more disrespect for the law and the rights of the parties than has occurred in this case. And that's true not only with respect to the government securing the judgments that we seek to vacate here, but frankly with respect to the conduct of the Rule 60B proceedings that has ensued over the past 10 years. This case began corrupt from the start. In 1960, the government literally turned one of Stonehill's lawyers into a confidential informant, that's their word, against him. And then an internal memorandum said, don't reveal the source, otherwise it will compromise the source. So at the very time the investigation was started by confidential information, by one of Stonehill's attorneys, the government not only took the information, they let him represent Stonehill. He filed the answers in this case. Worse, during the conduct of the underlying litigation, when the so-called Thompson Memorandum was identified as having been written to Chandler, the IRS agent who's at the heart of some of this, he said in his testimony there was some information attached, information from Honolulu that opened the investigation. Our client's counsel asked for a copy of that memorandum. The government internally located it. It was in the Manila correspondence files. They identified it as, quote, a document that could be reproduced. I mean, it wasn't subject to a State security privilege. But when asked to produce it, McCarthy and the government said they didn't have it. Just so you know what we've gone through in this case, when they first produced it in this case, repeatedly they produced it illegibly. When you looked at the document that would have revealed what I just said, you could not read it. They kept swearing that that's the best copy they have. And the only reason we got it is because Mr. Hagestad found some fortunate person in the FOIA release thing who said, oh, I can get you a clean copy, and she did, and it revealed what I just told you. If you thought that was the only thing that happened, it's a far cry from the truth, because many of the documents that we cite in this brief, when they first produced it, they produced it either illegibly or redacted. They redacted on grounds of relevance some of the most compelling evidence in this case, because the judge let them do that. And the only reason we knew it was not from this case, but because in FOIA litigation we got the documents that showed what they had redacted. In this case, before there were any suppression hearings, the chief counsel of the IRS, who was both a lawyer and the client of the Justice Department, wrote a comprehensive memorandum to the tax division that went to Mr. McCarthy. It said that the role of the government in planning and participation of the raids was, quote, significant. And it laid out all the items, all the factual items. And you can find what I just said in the record at 0710, record excerpt. That's what the chief counsel's memo says. It lists it right out there, and it lists all the activities. What McCarthy did with that information was not to be candid with the court, but rather to corrupt the record. So he elicited false testimony, and I'll describe that in a minute, from witnesses. He withheld from production of documents, documents that would have given lie to the government's story. When you say he elicited false testimony, what that says to me is that he elicited what he knew to be false testimony. Yeah. That's fair. I just want to make sure that that's what it is you're saying, because I'm sure lawyers elicit false testimony all the time not knowing it. You know, the witness says X, and, you know, if that's your witness, you know, you have reason to believe he's about to commit perjury, and then we have a set of rules that applies to that. But if you don't have anything that leads you to believe that perjury is about to be committed, you pretty much have an obligation to put the witness on the stand if it benefits your client. And if that's the standard, if that's what you're saying, and McCarthy had to know or did know, I'm just not sure what you've got to show that. I'm reluctant to give you some examples, but in the brief, there are a number. Why don't you give me a best example? Oh, there's so many. Let's see. On the false testimony, he certainly knew that Hawley, for example, the FBI agent, knew that he was intimately involved with the raid. He knew that when the raids were being scheduled, when they were being postponed, he, Hawley had, it's important once you, I'll give you a chess game here. Hawley told J. Edgar Hoover that they had promised, the NBI had promised to get documents for the government for their investigation. That would have been damning in this case. So what Hawley did was he denied any involvement, no knowledge about the raids. He said, I didn't know when they were scheduled. I didn't know they were postponed. He clearly lied about that. Right, but, but, but. But what does McCarthy know? All right. McCarthy has several points on just this one. I'll do other ones. But Hawley has the affidavit, pardon me, McCarthy has Hawley's affidavit, which he has sent at the request of the government. They're getting it for the criminal case, but they also send it to the civil people. It's initialed by Hawley, the cablegram transmittance. With handwriting on the cable, it says, original sent to New York, and copies, six copies to J. Edgar Hoover and others. That goes to the tax division. That goes to McCarthy. In that affidavit, Hawley says what I just said. Hawley says that he knew the raids were postponed. He was told by Lupon they were postponed, which, by the way, to be clear, McCarthy elicited false testimony from Lupon on this topic. Lupon claimed the raids were never postponed in the first place. Further, Hawley, I'm blanking on a couple of others. Hawley said he didn't give Chandler, he gave Wiretap transcripts. He denied having given Chandler Wiretap transcripts, when, in fact, he'd said that he gave them to Chandler in Tokyo, and that was a very relevant point. It's a long story why, but in the chronology of the story, that was a very important point, and Chandler had lied about that as well. There are series that we cover in the brief of where he says he didn't learn about not only the postponed raids, but when they were conducted, he said, I didn't learn about them to the paper the next day, but in his affidavit he says Noken of the NBI called me that day, and that's just an example there. On Chandler, there's really two parts to that that you need to know. You have a statement before this Court in 1968, where he tells the Court that no U.S. agent was involved in the participation in the raids, and he does that at a time he's already got in hand a memorandum from Sterling Powers of the IRS, who says he's talked to Noken and Luqman. He's gotten a picture folder from the NBI. He's compared it to the instructions that Chandler had given,  You know, let me cut to the chase for me. The soft spot in the case you're now bringing to us is as follows. At the original trial in front of Judge Westover in the suppression hearings, all, it seems to me, material parts for your purposes of the picture file were in fact in front of Judge Westover. There were a few pictures that maybe weren't there, but the damning evidence from your standpoint was the handwritten stuff by Chandler, and you had that. Now, you got it not because the government gave it to you. You got it sort of in some roundabout way that I don't understand, and you, meaning your lawyers representing Stonehill, did a pretty good job of trying to sneak up on Chandler and get him to perjure himself, and he kind of wiggles, and he has real trouble, and he smells the trap, and I'm not sure he ever perjured himself quite, but, boy, he's in trouble. The information that was in front of Judge Westover and then in front of our panel on appeal, which Judge Baloney and Judges Chambers and Browning, it seemed to me, now this is a long time after the fact and so on, I think Westover got it wrong. I think our majority got it wrong. I think Judge Browning was right. I think there was, as the IRS memo says, and you just quoted it, there was significant involvement of the United States, particularly by Chandler, pointing out originally, hey, you've left out the Army-Navy Club, going to the back of the other place and saying, have you checked that room yet, and so on. But my problem is that information in great part was already in front of the district court and already in front of this panel, and the stuff that you have found that adds to that doesn't really change the picture. Well, let me address that. I think I should. Just use the Army-Navy Club. It's an excellent example. Actually, I'll use the related one, the second raid location, because this is. The backroom thing. The backroom. In the interview notes of the actual interview, he said he went there because he was worried that they wouldn't search the backroom, and he wanted to make sure they did. He was worried, so he went there, a volitional act, and told them to search the backroom. The way this was spun by McCarthy, eliciting the testimony, was he went there out of curiosity. He was driving around. I think they quoted in their brief. He says, I was driving around with Ragland and Reynolds, and we were wondering if the second raid location would be as disorganized as the first. And we just wandered by, and then I ended up in a conversation with this guy about the backroom. And then I said, have you checked the backroom? No, that's right. And you may, but watch, this is what they were doing. In the case law, that memorandum, the IRS counsel's memorandum, lays out the operative case law and concludes they have a very serious problem. What McCarthy did was he looked at the exceptions to the case law, and he had people change their testimony. So we cite it in our brief. If you were just wandering by and it happened on the raid, it wasn't considered a volitional thing, participation in the raids. At least you could argue it. And that's what he did. He got them to say, he literally, it's as if he took the case thing and said, I was worried, so I went there and told them to search it. I was wandering around, and we just ended up talking about it. It literally, that's just one small example, but it changes the outcome. And you'll see the majority ended up. I'm not going to disagree with you on that. Kennedy. What am I going to do with this? Meaning, it seems to me that the district judge, and then even worse, our panel, the majority of two, I hate to say this so strongly. I think that panel willfully disregarded the evidence in front of it. And you've presented a little more evidence that they, that would push them in the way I think they would have gotten. I'm trying to figure out, if they're willfully going to ignore the evidence they already had, I think they were going to willfully ignore this little bit of additional evidence that you now got, too. Respectfully, that's not the, I think not and should not be the standard, and here's why. This is about, this is about the integrity of the court process. And if the government, the message to the government is, well, you can lie if it probably wouldn't have changed the outcome, that's not right. The U.S. Supreme Court in Hazel Atlas specifically rejected prejudice as an element, but for that very good reason. We shouldn't speculate. The IRS wrote a memo where they were very concerned about very specific evidence and what McCarthy did, and it's not one item. I mean, he literally moved everyone's testimony to the other side of the line. He didn't produce vast numbers of documents. And in the 60s, they have a point they can make. I mean, I can argue the other side, but let me go to the second suppression hearings. In those, Noken had now come forward with an affidavit. He says U.S. instigated the raids. They planned it. He says everything. And if you compare what he said, it's almost identical to what the IRS internally said. Judge Solomon says, deal from the top of the deck, is this man telling the truth? McCarthy is armed. We don't have these documents, but he has IRS documents that show that pretty much everything Noken is saying is true. And instead, he savages his credibility. He says he is a low-level informant. His job doesn't involve dealing with other countries' political representatives. While he has in his files a memorandum which says, Noken's mission critical to U.S. Treasury, written to the embassy in Tokyo, please extend all possible cooperation. I'm sorry. You know, getting you back to your specialist question, you know, you cite a lot of stuff, but it's not clear to me what is new. Okay. And how much of what you have now we can fairly say was not before the district court in the Ninth Circuit in the earlier case? What is new? Okay. First of all, just literally to ferret it out, when we cited the record sites, if we did it in bold, it meant we did not have it at the time. So all of our record sites that are in bold are documents we did not have at the time. So in terms of reading our briefs, that's how we have a footnote that explains that in both the original and reply brief. That's what's new. As a document, then you would say, but what facts are new? The facts are, there's a litany of them, but I'll show you, that I'm just going to do this sort of off the top of my head. In February, there's a meeting, which we knew there was a meeting between Diagno, Minister of Justice, and Siegenthaler's assistant to Robert Kennedy. Diagno wanted the meeting to make sure there would be coordination in the raids. They produced a document that said that related to a more benign explanation that they wanted to meet because he was interested in coordinating the New York proceedings of the Americans with his Philippine one. What they didn't produce was a document that said, I want manpower for the investigation. What they didn't produce were documents that showed right then, within two days, agents were assigned. Documents from whom to whom? The documents go, the ones I'm talking about are generally Chandler to Thompson, or, well, Thompson memo. Thompson is Chandler's boss. He's an IRS high up guy. Thompson is assigning agents. What McCarthy did, I'll give you an example. On February, I think it's 13th, 1962, Thompson writes a memo. It says something like, I haven't got authority for agents. That's produced. The next day, he writes a memo reflecting that that afternoon, he got authority to assign agents. That's not produced. McCarthy argues, they hadn't even assigned agents until after the raids. Why is that important? It changes the whole story. Because, remember, Nopan, when he comes forward eventually, says they extended the raid date from February 24th to March 3rd, so U.S. agents could arrive. McCarthy goes, that's ridiculous. They hadn't even been assigned. What he doesn't produce are the documents that show, yes, they'd been assigned. Ragland, who was supposed to arrive before the 24th, couldn't get there. He didn't get there until the 26th. They moved the raids to accommodate the U.S., a big deal. But that whole story was left out from the court. So, too, is the document that said it would be extremely dangerous if the purpose of the meeting between Diagno and Siebenthaler were known. That wasn't produced. Numerous documents reflecting U.S. desire to get – commitments to get documents and raids weren't produced, that the documents would be fully available. See, remember, in this case, our clients didn't get access to any of the million documents that were taken. They got originally the 30,000 the government copied. I think they got those. But that's what was cherry-picked, the 970,000 documents they never got. And one of the reasons they never got it is because the government acted like, well, we don't have any control over the NBI. They're only showing us what documents they choose to share from the raids. And that's a McCarthy affidavit. That's a representation to the court. He has internal documents that have words like documents fully available. They're giving us whatever we want. They're moving it to a space. Originally, they weren't physically available because it was in a tiny space at the NBI. They don't produce documents that reflect or tell us that reflect. Luke Bond, of the NBI, originally asked if he could store the entire documents in the U.S. Embassy. He was going to put the entire raid documents on U.S. soil, effectively. So when McCarthy is telling the court, we can't control these documents. We can't get them for the taxpayers because we're just getting what the NBI chooses to give us. And he has tons of internal documents that reflect precisely the opposite. Even when they quote in their brief, they quote out of context, and if you look at the rest of the document, where it suggests at one point they had trouble getting them, he goes, but during the free access period, we copied everything we wanted. Directly contrary to what McCarthy told the court. And the reason, I know it's a long story and it takes a while to tease out, but this is a comprehensive fraud. This isn't just a document not produced. This is not a witness. It was a series of witnesses and a series of false representations. I mean, the Noken one to me is, he's saying all the things that internally the IRS had said. He's saying the U.S. planned to participate. I'm sorry. We'll hear from the government. Thank you. May it please the Court. I'm Frank Seiler, representing the United States. My colleague, Charles Duffy, is with me at the council table. The hardest part about preparing for this argument was to articulate the rule that defendants are asking this court to apply. As best as I can make out, it goes something like this. In a civil case, which this is, the failure of any agency of the federal government to disclose any information in its files concerning the defendants, directly or indirectly, constitutes fraud on the court. That's without regard to whether the disclosure is required by the federal rules of evidence, without regard to whether any request was made for the information during the course of discovery or trial, without regard to whether the evidence was proffered. I'm not sure that's a fair characterization. And what does it matter how they characterize it anyway? What it seems to me they are arguing is that the United States took the position that these raids were entirely directed by the Philippines, MBI, the Philippine police, and that, in fact, they were planned and directed by the Americans, using the Philippines as cat's paws. That's their theory, as I read the brief. And what's so difficult about articulating that, and what is your answer to that claim? To their theory? Yes. I think the short answer is there's no evidence, other than what was before the court at the time, of instigation or participation by the U.S. government. And without re-arguing or re-litigating the 1968 case, we're talking about a claim of fraud on the court. And the question we have to address, I think the court has to address, is what are the standards? What are the rules of law? How is litigation and discovery to be conducted? I'm a lawyer for the government. It's my obligation, ethically, legally, to be a zealous advocate for the government. This is a civil tax case. The responsibility of the government lawyer was to be a vigorous advocate for the U.S. in asserting a civil tax liability against these individuals. Yes, but what if we were to conclude, as I think the evidence now in front of us would allow us to conclude, that McCarthy knew that Hawley was lying? Hawley was lying. There's no question about that. And there's a fair amount of evidence that maybe McCarthy knew that he was lying. I will present, if I may, from the question of whether Hawley was lying, Your Honor. I disagree today as I did nine years ago. You say that Hawley was not lying? I'm agnostic on that point, and I'll tell you why. He had a 350-page deposition. And I suggest that if you haven't, read the whole of his deposition. It's not the deposition of a liar. He was deposed in January of 1967, six months before the suppression hearing. He had no motivation to lie. In his deposition, he said he knew about the raids ahead of time. He knew they were scheduled originally for February 24th and were then postponed. Yes, he said he didn't. In his deposition, he didn't know the night before. What about Hawley saying he really didn't have any of those wiretaps? It turns out he had lots of wiretaps. He did. I don't recall anything in there that Hawley said. I think the question was whether he wiretapped. I always like to question the Chandler and Hawley saw wiretaps that were provided at various times. But more importantly, when we're talking about Hawley and his deposition, whether or not he was lying, his deposition, the 350 pages, was not offered into evidence. He was not a government witness. He did not testify at the trial. A total of 25 pages of that deposition were entered into evidence. Nineteen by the defendants, six by the government. There's nothing in those pages about his knowledge of the raids or timing the raids or anything that was questionable. That's why I come back to my initial point about trying to comprehend what the rule is that this court is being asked to apply. You know, how do I have to tell a young lawyer at the department what his obligations or her obligations are to the court? Well, that's easy. The question of the lawyer's obligation to the court are quite different from the question of a party committing fraud. The lawyer can be entirely forthright with the court, but he's being fed a bunch of lies by his client. The client can, nevertheless, commit fraud in the court without the lawyer's complicity. Well, I don't see what's wrong with that. But, Your Honor, I don't think Your Honor would suggest that because the client or witness lied, that that was fraud in the court that would allow for a vacation of judgment. I don't know. I think that would be a radically new rule of law. I don't think there's any precedent for that. Well, I think you're probably wrong on that. Is there a contrary precedent? Pardon? I mean, we have precedent saying that mere perjury by a witness is not fraud on the court. I don't think we have any precedent that says that if a party decides to engineer an entirely false case and use an honest lawyer to feed an entirely false case to the court, that that can't be fraud to the court. What precedent do you have saying that? I don't know of any such case, and it's certainly not this one, Your Honor. All right. So whatever we say on the subject will be new. So, you know, holding down the specter, oh, my God, you've got to make new law, it's hardly, you know, we've got to make new law one way or the other. There's no law on this at all. Why don't you persuade me why a party should be entitled to, you know, suborn perjury, manufacture documents, and, you know, line up false witnesses, create a sort of massive fraudulent case, and then say, oh, we're okay because our lawyer was an honest lawyer, and he honestly and scrupulously put on the fraudulent case that we fed him. Why is that a good rule? What's that? Well, I would have no intention of defending that. I think that's a good rule. I say I would have no intention of defending that. I think that would be indefensible. But that's not the case we're talking about here. I'm not asking you to defend it. I'm asking you to you said you don't know what the standard is for fraud in the court, and you focused on the responsibility of the lawyer. My question was I don't know why the lawyer, why you couldn't be committing fraud in the court and have a perfectly honest lawyer. The doctrine is not misconduct by the lawyer, which is a different doctrine, and we have ways of dealing with that. The doctrine is fraud on the court, and it seems to me fraud on the court is fraud by a party on the court. But there was no party. The only parties here were the defendants and the United States government. No, no. We're not going to talk about this case until we set out the standards. So, you know, once we agree what the standard is, we can now apply what can apply. You know, let's say it turns out there was evidence in fact that the government of the United States just massively manufactured this idea. The MBI had no interest in this thing. They got so the United States is there and say, well, it will help you get rid of these Pesky Americans. And the way we're going to do it is we're going to get you a road map as to where you can go get this evidence to not only get rid of them out of the country, but also it will give us a way of destroying them politically and financially by seizing evidence we can use in a tax case. And here it is, and we're going to lay it out to you. And then when they go to court on the tax case, they don't tell the tax lawyer because they know tax lawyers are, you know, lawyers that appear in court are scrupulous, and they don't tell them. They lie to the lawyer. Now, why isn't that why wouldn't that be? I mean, assuming that that's what they're showing, why wouldn't that be sufficient to show fraud in the court? It might well, Your Honor, but I think you're right. Okay. So let's, if it might well, then what, why isn't that the case here? Now we can talk about this case. I think if you're suggesting it would be a new holding, I think it would be a new rule. You know, I'm not scared of new holdings, you know. Just what are you scared of new holdings? I think we've done it before. We've done it before, and we never get reversed. Well, I don't think we're scared of being reversed. I mean, if you say it's something that's contrary to Supreme Court authority, then that might be, you know, certainly be something. But is it something in the Supreme Court? I would, I would. In fact, I'll put my cards on the table. I think Judge Kaczynski's description of fraud on the court by parties that have engineered the fraud and used their lawyer as an instrumentality of that court, there is already existing law that suggests that that's fraud on the court. I don't think that's a new doctrine. That may not be. I must confess I haven't encountered that case law. So we don't just focus on McCarthy, right? We can assume McCarthy was clean as a whistle. Well, you should, but I don't. Well, let's say we do. Well, let's assume he was. Let's start talking then about such things as Mr. Hawley. And, you know, as I indicated, if you want to focus on Hawley, read his deposition in full. Recall that he was testifying five years after the event. Recall that in his deposition he noted he had opportunity to do very little review, had very few files available to him. He may well have taken a different position if he'd been confronted with the cable gram that he'd sent to Mr. Hoover. That may have refreshed his recollection. The fact of the matter is nobody had requested, the defendants had not requested that the FBI produce any documents at that time. They weren't they hadn't been collected. They were not available at the time of his deposition. A week before the suppression hearing was the first time they asked for FBI files. And Mr. McCarthy objected, saying we have a week before the hearing, it's going to take a while to pull these together, we need more time. Nonetheless, the parties asked, or rather, the judge asked, if he could defer ruling on the motion to produce. Defendant's counsel said yes. They had, were able to renew it during the course of the trial, did not. And the documents were assembled by the FBI. They were produced because of it. The harder part of the case for the government in the initial hearing in front of Judge McCarthy was to minimize what Chandler had done. Chandler had provided notes that went into the picture file in his own handwriting directing where the search ought to take place. Chandler also did his own independent research, having been prompted by Spielman. He goes to the Army-Navy Club. He discovers the room rented under somebody else's name. He then suggests when they're drawing up the warrants that they make a warrant for the Army-Navy Club as well. Afterwards, he's told, well, we hit the jackpot at the Army-Navy Club. That stuff is just absolute smoking gun in terms of significant involvement by the Federal Government in the raid, which should have produced a suppression or a grant of the suppression motion. Now, what we're hearing is that the government through Chandler, maybe with and maybe without the assistance of the attorney McCarthy, shades that testimony so that instead of Chandler testifying, well, I was worried they were going to miss that back room. He says, well, I was just kind of aimlessly wandering around and I saw some lights on or whatever he says. Now, that really is different testimony. What do we do with that? I mean, because we now know that that's not what Chandler did. Chandler went there on purpose because he was worried they weren't going to find it. Your Honor, I don't know how I could come to that conclusion some 40 years after the fact without talking to Mr. Chandler or seeing him live. I mean, for the papers we now have, we know that Chandler went there because he was concerned they were going to miss it. I don't think there was any question about that at the time. I think the evidence at the time established that. I think his own testimony established that. I mean, read Judge Browning's dissent. I mean, I think Judge Browning, you know, and I fully understand why you would agree with Judge Browning. I mean, you said you would have agreed with him and I think you would on the record. But that, to me, you're suggesting you can relitigate or overturn the decision on the merits. Well, I'm trying to figure out what other evidence might have been introduced and in what form at that original hearing in front of Judge Westover that then produces the appeal that wasn't there that would finally have forced Judge Westover and the two judges in the majority to face the case that they had in front of them. I have no way of answering that, Your Honor, because Were there pictures in front of Judge Westover? No, but the, you know, again, the photographs were not, you know, the testimony was of Major Del Rosario was that the MBI had taken pictures, had a photographic file. It was Do we know what was in it? Well, we do now. It came out How do we know that this is the same, this is what was in the file then? Well, I think defendants have been insisting that these are the ones that were in the file. I'm not sure. You know, I think, I think the, you know, their argument has been that, look, these were the photos that came from the MBI file that Mr. McCarthy received. I mean, I'll throw you a line on this one. It seems to me the pictures aren't particularly damning because they are photographs. The indications and numbers and so on are not, they're not in Chandler's handwriting. Right. The real smoking gun they had at the suppression hearing, which was to say the notes written in Chandler's handwriting. Those were in front of Judge Westover. I understand that. Yes. Well, but the photographs came Those were the original notes, which apparently came from the same file as the photographs. They were introduced and presented by defendants. One way or another, they had access to that picture folder. They had their sources at the MBI. As Mr. Powers said in his memorandum, part that they, defendants keep skipping over, as he told Mr. McCarthy and the world, it was in all possibility was, probability was that the defendants had the photographs as well. And when you look at it, when you look at the cross-examination by Mr. Rand, as he's cross-examining Mr. Chandler, he's saying, well, did you write anything? Did you write anything on the pictures? Did you write anything separately from the pictures? Did you write anything on the pictures? He just kept coming back to that. And I would have to assume that if I received the pictures after the hearing and saw them, I would say, oh, that's what they were referring to. That's what they knew about and what they're referring to. And those photographs and the notes were all consistent with Chandler's testimony. He said he had a vague recollection of seeing some photographs. He didn't say flat out he never saw any photographs. You know, Del Rosario had testified that the NBI had taken photographs and had a photographic file. That was in their brief to this Court in 1968. When defendants noted that, brought this out not only in the cross-examination, but also in their brief on page 65. You know, when Major Del Rosario testified he'd seen an NBI picture folder and the photographs were made by the NBI prior to the raids. Now, they knew about the folder. Everything there was what Chandler said was consistent. There was no indication Chandler was lying. Now, I don't know what additional body of evidence could have been produced to sway the majority, Your Honor, in 1968. I suppose I could fabricate something. All I can say is there's nothing that's come out to date that I think would have tipped the scale. And I would note that much of what has come out, most of it, all of it has come out that is ostensibly new, has been produced by other agencies. FOIA requests from the IRS particularly, the FBI particularly, these do not come from the Department of Justice files. So? So I think historically, I think as this Court has noted, the Judge Tanner noted, in most cases, knowledge, it's very important that you look at the knowledge of the lawyer. I mean, if we're talking about the conduct of the lawyer. Yeah, but we've been over that. So at least as I view the law, if the fraud is organized enough and extreme enough, it is fraud on the Court even though the lawyer was innocent of the fraud. Then I think you'd have to find evidence of organization, conspiracy. You don't have that here. Where's the organization? Who was masterminding this? I mean, I'm sorry. The evidence is consistent with the picture that was before the Court in 1968. I mean, Judge Browning admittedly thought that the mere fact that Hawley and Chandler brought Spielman to the Philippine authorities was wrong. Somehow this was instigation and participation. Well, if that's the standard, then it was. But there was no fraud on the Court. I mean, they were – Hawley and Chandler, the whole story was laid out there. Okay. Thank you. Thank you, Your Honor. We are pretty much out of time. We'll give you a minute for a bottle, if you'd like. Mr. Gerstin. If I might, just on – let's do the picture folder. It's not as straightforward as being presented. Mr. McCarthy said to this Court – Speak to the mic. Mr. McCarthy said to this Court, by no stretch of the imagination were Chandler's notes and map directions by Mr. Chandler to the NBI or to anyone else. He had the Powers memorandum and the picture folder, and Powers said, yes, they were. That's what they were. And Your Honor said, but those were Luke Bond's notes. That's the whole point. He had his notes, and his story was, well, I wrote these notes. I was just talking to Spielman, kind of like interview notes. Well, the picture folder shows, no, your notes, as Powers said, it correlates directly to the pictures, the numbered instructions tied to the numbered pictures on the folder, and Luke Bond's writing it down. That's exactly what our side was trying to say, but we didn't have the evidence to connect that last time. And McCarthy went on. He said the only logical – while he has that folder and we don't, the only logical explanation of Chandler's notes – I mean, Chandler's notes is in brackets – is that they contain responses to answers elicited from a person being interviewed. Chandler didn't know which premises the NBI was planning to raid. That's representations by Mr. McCarthy to this Court when he's holding a picture folder that is to the contrary, and his client has said it's to the contrary. It's damning evidence. And the Hawley thing is critical. Yes, in the final hearing, it got minimal play, but it got minimal play because Hawley said, I didn't know Chandler was doing a net worth case, even though he was telling Hoover he was. He said, we weren't trying to get documents for the U.S. government. They had sent a memorandum about the New York investigation for what the issues were, what documents they need, and he had told Hoover, the head of the FBI – you don't forget – he told the head of the FBI, Luke Bond has promised to get us documents for that investigation, directly contrary to the whole government's position. And that is damning. That's outcome determinative on the raids. You don't have to speculate. Thank you. The case is argued with stance admitted. We are adjourned. Thank you.
judges: Kozinski, Reavley (5th Cir.), W Fletcher, Cjj